Filing # 147851716 E-Filed 04/18/2022 01:17:50 PM

## IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

### GENERAL JURISDICTION DIVISION

Case No. _____

**OPERA TOWER CONDOMINIUM ASSOCIATION, INC.,** a Florida not for profit corporation

      Plaintiff,

vs.

**HOMEAWAY.COM, INC.,** a Delaware corporation

      Defendants

_____/

### COMPLAINT

Plaintiff, **OPERA TOWER CONDOMINIUM ASSOCIATION, INC**. (the "Association"), files this action against the Defendant, **HOMEAWAY.COM. INC**. ("HomeAway" or the "Defendant") and in support thereof alleges the following:

1.      This is an action for aiding and abetting breaches of a declaration of condominium, trespass, aiding and abetting trespass, injunctive relief under FDUTPA and injunctive relief.

2.      HomeAway is in the business of brokering living spaces for rent for travelers seeking short term lodging for vacation or business travel. In the HomeAway business model, parties who list lodging accommodations on HomeAway's website are known as "Members" while the travelers who rent the listed units are known as "Users". HomeAway makes no effort to confirm that its Members have the legal right to rent units on a short term basis.

1

3.      Upon its completion sometime in 2007, the City of Miami issued certificates of use and of occupancy to the Opera Tower Condominium as an apartment or multifamily building. Pursuant to the City of Miami zoning code, short term rentals (rentals for a period of less than 30 days in duration) are not allowed for the apartment or multifamily use.   In order to engage in short term rentals, an apartment or multifamily building owner must obtain certificates of use and occupancy for lodging,  obtain approvals from building, zoning, planning and comply with life safety requirements and the American with Disabilities Act requirements, among other requirements. Further, the owner must also comply with the requirements of the Determination of Use issued on March 1, 2019 by the City of Miami Planning Director. In August, 2020, the City of Miami has issued a cease and desist letter to the Association demanding that the Association cease all short term rental activity at the condominium property.

4.      Despite the fact that the Opera Tower Condominium does not have a certificate of use for lodging, HomeAway has allowed short term rentals at the Opera Tower Condominium. In July, 2020, the Association sent a cease and desist letter to HomeAway, demanding that it cease all short term rentals. To date, HomeAway has refused to cease short term stays at the condominium property, causing the Association to be in violation of the City of Miami zoning code and subjecting it to legal action and monetary fines by the City of Miami.

**THE PARTIES**

5.      The Association is a not-for-profit corporation, duly organized and validly existing under the laws of the State of Florida.

6.      Defendant HomeAway, Inc. is a Delaware corporation that is authorized to, and presently does, conduct business (either directly or through subsidiaries and affiliates) in the State of Florida and in Miami-Dade County.  HomeAway, Inc. operates an online community platform,

2

accessible via the domain name www.VRBO.com and an application for mobile phones and tablets, which provides rental brokerage and booking services for rental transactions between Members and Travelers.

## JURISDICTION AND VENUE

7.      The Defendant is subject to the jurisdiction of this Court because it operates, conducts, engages in and carries on business in Florida and because it has committed tortious acts within Miami-Dade County, Florida.

8.      Venue is proper in Miami-Dade County pursuant to Florida Statute 47.05 because the real property that is the subject of his action is located in Miami-Dade County and pursuant to Florida Statute 47.011 because Miami-Dade County, Florida is where the causes of action accrued.

## GENERAL ALLEGATIONS

### I.  THE OPERA TOWER CONDOMINIUM

9.      The Opera Tower Condominium was established by the Declaration of Condominium filed on December 26, 2007 in Official Records Book 26127, at Page 872 (the "Declaration").

10.      The Association is the entity responsible for operating the Opera Tower Condominium located at 1750 North Bayshore Drive, Miami, Florida.

11.      The Opera Tower Condominium is a 665 unit condominium, consisting of 20 commercial units and 635 residential units.

12.      The Declaration provides, at Section 16.1, "Each Residential Unit shall be used in accordance with all applicable county and state zoning codes, ordinance and regulations…" (A copy of the relevant provisions of the Declaration are attached as Exhibit "A")

13.      The Rules and Regulations for the Association, at Rule 8(g) specifically prohibits short term rentals and provides as follows:

3

In accordance with City of Miami Zoning regulations applicable to the Opera Tower Condominium, no lease shall be for a period of LESS than thirty (30) days. Unit Owners and Tenants may not list units for short term rental (less than 30 days) at any online platform including but not limited to HomeAway.com, vrbo.com, booking.com, tripadvisor.com, hotels.com. (see attached Exhibit "B")

14.     Further, the Association requires every occupant to register with the Association as a resident and to be screened for credit and criminal background.  As part of the registration process, the Association requires prospective tenants to provide a fully executed lease agreement. The Association's registration process is intended, inter alia, to create a roster of the Opera Tower residents, safeguard the security of the condominium residents and owners, and ensure that only authorized persons gain access to the condominium property and units.

## II.    THE MIAMI 21 ZONING CODE PROHIBITS SHORT TERM RENTALS IN THE TRANSECT 6 ZONE WITHOUT A CERTIFCATE OF USE AND CERTIFICATE OF OCCUPANCY FOR LODGING

15.     The City of Miami is a political subdivision of the State of Florida and has jurisdiction over the Opera Tower Condominium. The City of Miami Zoning Code was enacted by Ordinance 13114 on October 22, 2009 ("Miami 21").

16.     The Opera Tower Condominium is zoned T6.  While lodging may be allowed by right, warrant or by exception within Transect 6, Miami 21 requires a multi-family building to comply with the requirements of the City of Miami permitting process, including Building, Fire and other life-safety requirements applicable to lodging uses. Further, any building offering lodging must comply with all requirements of the Americans with Disabilities Act (ADA") applicable to lodging uses and have the appropriate Certificate of Occupancy and Certificate of Use for lodging.

17.     The Opera Tower Condominium was completed on or about 2007. The condominium was issued a certificate of occupancy and a certificate of use for multi-family/apartments but not for lodging.

4

18.     Under Miami 21, short term rentals (rentals of less than 30 days) are not an allowed use for multi-family/apartments.

19.     Despite the fact that units at the Opera Tower Condominium cannot be rented on a short term basis, some unit owners and/or renters at the condominium are actively listing and renting units for short term rentals by using the VRBO.COM website and/or mobile application.

20.     As alleged herein, the short term rentals have damaged the Opera Tower Condominium property, increased the Association's costs of operation, and created an unsafe living environment for the Opera Tower Condominium's permanent residents and owners.

21.     On August 6, 2020, the City of Miami issued a cease and desist letter to the Opera Tower Condominium advising that the City of Miami Code must be complied with in order to provide lodging. The Opera Towner Condominium is now subject to fines, legal proceedings, and per diem interest as a result of the illegal business practices of HomeAway. A copy of the cease and desist letter is attached hereto as Exhibit "C".

### III.    HOMEAWAY'S BROKERING OF SHORT TERM RENTAL TRANSACTIONS AND MATERIAL CONTRIBUTIONS TO CONTENT POSTED BY ITS MEMBERS

22.     HomeAway, through its subsidiary and/or brand VRBO.COM (Vrbo), has over 2 million bookable vacation rentals.  Vrbo connects homeowners with vacationers by offering an array of rental property types such as condos, cabins, lake rentals, beach houses, and more.

23.     To become a Member, a person must complete a profile and create a listing for their space (although, as alleged hereinafter, HomeAway often assists in creating and modifying the content for that listing).

24.     HomeAway walks Members through a sequence of questions requiring them to provide information about their space (e.g., address, location on a map, home type, description,

5

etc.), submit at least six (6) photographs, and provide certain personal information. The Member finalizes the listing by clicking the "Go Live" option.

25.     When a Member creates a listing, HomeAway does not ask if the Member's property can be rented daily or on a short term basis.

26.     Upon completion, the listing becomes publicly available on the VRBO.COM website and mobile applications, and the space becomes available for Users to book accommodations.

27.     Users can search for accommodations by city, neighborhood, or property name. In the case of the Opera Tower Condominium, listings appear under either the property address or the name "Opera Tower".

28.     HomeAway provides Users auto-complete options in the search tool to help Users locate specific listings.

29.     HomeAway keeps the address for any listing confidential until a booking is confirmed.

30.     To book a listing, Users must provide their name, email address a confirmed telephone number, a profile photograph, an introductory message, and payment information. Users must also agree to the Members "house rules". Members may, but need not, require Users to provide other identification before booking.

31.     When a User books a stay, HomeAway sends an email to the User confirming the reservation and disclosing the Property's physical address to the User. HomeAway does not disclose the Member's real name or personal email address.

32.     HomeAway collects and transfers all payments between Users and Members.

33.    HomeAway does not charge fees for publishing the rental listings. Instead, HomeAway collects a commission or "service fee" for all accommodations booked through its website or mobile application.

34.    Thus, HomeAway does far more than just offer a platform for Members and Users to connect and provide payment transaction services. In addition to acting as a rental broker, HomeAway provides a number of services and guarantees to encourage and assist Members to list and Users to book short term rentals.

35.    HomeAway has made agreements with certain local governments, including Miami-Dade County, to collect and remit local taxes on behalf of Members.

36.    HomeAway provides Users and Members with customer support 24 hours a day, seven days a week. HomeAway acts on behalf of both Users and Members, providing communication, guidance, and assistance that is essential to causing rentals of units at the Opera Tower Condominium.

37.    HomeAway maintains a secure messaging platform within the Vrbo website or application so Members and Traveler can communicate without disclosing each other's respective personal email addresses and be protected from phishing and identity theft.

38.    After a prospective User searches for an accommodation but does not book, HomeAway sends follow-up emails promoting specific accommodations in the location in which the prospective User was searching. HomeAway has sent emails to prospective Users advertising and promoting units at the Opera Tower Condominium.

39.    HomeAway provides a secure online payment system to protect payments between guests and owners.

40.      HomeAway provides members (owners) with $1,000,000 in liability protection for all stays processed online through Vrbo checkout at no additional cost as a "first defense if a guest makes a claim"

41.      HomeAway provides property damage protection coverage up to $5,000.00 for accidental damage sustained by a member (owner) for bookings paid through Vrbo.

42.      HomeAway provides Users with a "Book with Confidence Guarantee" to assist with issues arising from property access, payment protection, owner cancellation and material misrepresentation of property descriptions. Through this program, HomeAway finds alternative accommodations for Members having issues with a reservation.

43.      HomeAway offers its Members exclusive access to "MarketMaker' an online trademarked pricing tool that delivers market data to help its Members set competitive vacation renal rates that reflect current supply and demand. HomeAway represents to its Members that MarketMaker provides up to the minute market information to analyze:

  a.  Real-time supply and demand data;
  b.  Competitive rates of booked vs unbooked properties
  c.  Local events affecting area travel
  d.  Forecasted occupancy data
  e.  Average rates of similar properties;
  f.  Booking lead time;
  g.  Search data from current and prior years; and
  h.  Historical listing performance

44.      HomeAway's business practices meet the definition of a "Broker" pursuant to section 475.01(1) of the Florida Statutes, including, but not limited to, HomeAway's offering of real property for rent in exchange for valuable compensation in the form of booking fees.

**IV.   The Association Is Unable to Stop Illegal Short Term Rentals Without Court Intervention**

45.     HomeAway currently lists numerous units for short term rentals at the Opera Tower Condominium. However, the exact number is unknown to the Association. When the address is typed into the property search function on the Vrbo website, the search yields 300 plus "stays". Members often use a profile name that is not their real or complete name and may not use the name "Opera Tower" in the property description of the listing.

46.     The Association cannot, as a practical matter, know who is renting out units in the Opera Tower Condominium on the Vrbo website or mobile application. The Users who rent units do not fill out the Association's registration documents or go through a credit or background check. The Users are not made aware of the provision of the Declaration or the Rules and Regulations of the Association.

47.     The Association has hired an additional full time staff member whose sole duty is to assist the Association with additional administrative burdens imposed upon it by virtue of the HomeAway short term rentals.

48.     The Association's security contractor attempts to block Users from gaining entry into the property. However, once the Users are inside the property, the City of Miami police will not get involved in removing them.   Thus, the Association has no remedy to enforce the Declaration once the Users gain entry into the building.

**V.   HomeAway's Brokerage of Short Term Rentals Has Damaged the Opera Tower Condominium Property, Increased the Association's Costs of Operation, Created an Unsafe Living Environment, and Diminished the Reputation of the Opera Tower Condominium in the Community**

49.     Short term rental activities through the Vrbo website and mobile application have caused significant damages to the Association.  The common areas of the building have sustained accelerated wear and tear due to the heavy traffic brought by the HomeAway Users.

50.     In October, 2018, the Association's general liability insurance carrier refused to renew its policy due to the plethora of short term rentals. The Association was able to bind coverage with another carrier but at an additional annual expense of $93,000.00.

51.     Since 2019, the Association has spent an additional $200,000.00 annually on janitorial services arising from the short term rentals.

52.     However, since the Association has no control over booking of individual units, it is not even aware of the identities of the persons who come and go from the HomeAway short term rentals at the Condominium.

53.     Residents and Owners at the Opera Tower Condominium routinely complain to the Association's management about the short term rentals interfering with their safety and quality of life.

54.     Local Miami TV station WSVN ran a story in early August, 2020 detailing the residents' fears for their safety. Many owners and renters have elected to leave the building due to the plethora of problems caused by the HomeAway Users. The story can be found at the following link: https://wsvn.com/news/investigations/residents-at-2-miami-condos-fed-up-with-short term-rentals-pandemic-parties/

## VI.     HomeAway Has Refused to Enforce its own Terms of Service or Cease Short Term Rental at the Opera Tower Condominium

55.     In HomeAway's Terms of Service, at Section 1, HomeAway requires its Members to "agree that they are responsible for and agree to abide by all laws, rules, ordinances or regulations applicable to the listing or their rental property and the conduct of their rental

business.." HomeAway recklessly relies upon this representation and warranty by its Members and does absolutely no due diligence of its owner to determine the veracity of the same.

56.     Further, the HomeAway Terms of Service, at Section 36, provide a right to terminate listings. Section 36 provides in pertinent part:

> If, in our sole discretion any member submits unsuitable material to our Site or into our database, **is not abiding by local rental regulations and is creating a nuisance in its community**, misuses the Site or our online system or is in material breach of these Terms, we reserve the right to limit the member's use of the Site, impact the member's listing(s) search position, and/or terminate such member's listing immediately without refund…(emphasis added)

57.     On July 10, 2020, the Association sent the Defendants a cease and desist letter demanding removal of all listings at the Opera Tower Condominium. A copy of the cease and desist letter is attached as Exhibit "D".

58.     To date, HomeAway has refused to terminate short term listings at Opera Tower Condominium.

**VII.     HomeAway's Business Practices Harm Its Own Consumers**

59.     The Association must act to enforce the terms of the Declaration and abide by the terms and provision of Miami 21. In so doing, it must take reasonable steps to prevent owners and residents at the Opera Tower Condominium from engaging in short term rentals.

60.     Once a User arrives at the Opera Tower Condominium the Association cannot legally remove such User from the condominium property.

61.     The Association has learned that many of these Users not only booked a short term reservation but also spent considerable monies purchasing airfare to travel from their home cities.

62.     The advertised short term rentals on the Vrbo website and mobile application do not contain any warning that the building is not approved for short term rentals, despite the fact that the Association has sent cease and desist letters to both HomeAway and Members.

11

63.     HomeAway has the legal right to terminate listings one it learns such listings are not allowed under applicable law.

64.     Any reasonable consumer would believe that HomeAway takes measures to verify the legality of accommodations offered on its platform, or at a minimum, removes listings or prevents transactions it learns to be unlawful or unauthorized, such as the short term rentals at the Opera Tower Condominium.

65.     Quite brazenly, HomeAway makes no effort to either verify the legality of accommodations or even to remove listings once it has been informed that its listings may be illegal. HomeAway's business model calls for it to continue riding the gravy train of booking fees from its illegal listings and dare affected real property interests to sue it.

66.     Instead, HomeAway relies on the fine print of its 27 page Terms of Service which provides, at Section 1, that "any part of an actual or potential transaction between a traveler and a member, including the quality, condition, safety or **legality of the properties advertised…are solely the responsibility of each user.** (emphasis added)

67.     Incredibly, HomeAway imposes the obligation on its Users to investigate the laws, rules or regulations pertaining to listings. HomeAway knows that its Users are typically vacation travelers booking a stay in a foreign state or even country. As such, the Users have absolutely no capability to investigate the laws or regulations that pertain to listings. From the Users perspective, they are booking the equivalent of a hotel room and have no reason to inquire into the laws or regulations that pertain to the listings.

### COUNT I – AIDING AND ABETTING BREACHES OF THE DECLARATION

68.     The Association re-alleges and re-avers paragraphs 1 through 67 as if fully stated herein.

69.     This is an action for damages against the Defendants for aiding and abetting breaches of the Declaration on the part of the residents and owners at the Opera Tower Condominium who become HomeAway Members.

70.     The residents and owners who serve as Members in the Vrbo website and mobile application have a duty to abide by the terms and conditions of the Declaration in the leasing of units.

71.     The resident and owner Members have failed to comply with the Declaration.

72.     Specifically, the resident and owner Members have failed to abide by the terms of Section 16.1 of the Declaration which provides "Each Residential Unit shall be used in accordance with all applicable county and state zoning codes, ordinance and regulations…" and the terms and provisions of the Rules and Regulations which prohibit short term rentals.

73.     The Defendants have aided and abetted the resident and owner Members in breaching their duty to abide by the terms and conditions of the Declaration and caused damages to the Association.

WHEREFORE, the Association demands judgment against the Defendants, plus costs, prejudgment interest, and such other and further relief this Court deems just and proper.

## COUNT II – TRESPASS

74.     The Association re-alleges paragraphs 1 through 67 as if fully set forth herein.

75.     HomeAway uses the Association's property for its own financial gain with no right or authority to do so. HomeAway has brokered and profited from illegal short term rentals of units at the Opera Tower Condominium.

76.     The Association does not consent to the entry of HomeAway Users onto the Association's property, including the common elements and limited common elements.

77.     HomeAway's intentional acts of encouraging, promoting, facilitating, and brokering short term rentals of units at the Opera Tower Condominium have caused HomeAway Users to enter onto and make use of the Association's common elements and limited common elements.

78.     HomeAway's Members have no authority or ability to rent out units at the Opera Tower Condominium for short term rentals. The fact that HomeAway Users may enter the Association's property with the purported permission of a Member is irrelevant.

79.     The Declaration expressly provides that each residential unit must be used in accordance with all applicable county and state zoning codes, ordinances and regulations.

80.     HomeAway's Users enter upon and use the Association's common elements and limited common elements without the consent of the Association.

81.     HomeAway is directly responsible for and has caused and actively encouraged its Users to enter the Association's common elements and limited common elements.

82.     As a direct and proximate result of HomeAway's conduct, the Association has been damaged, including without limitation, in the amount of the reasonable rental value of the units rented through the Vrbo website or mobile application, the amount of the benefits received by HomeAway as a result of the illegal short term rentals, property damage to the Association's common elements and limited common elements, costs of providing additional security and monitoring for short term rental activities, legal fees and reputational damage to the Opera Tower Condominium, and exposure to potential penalties and per diem interest for violations of Miami 21.

WHEREFORE, the Association demands judgment in its favor and against the Defendants for damages, costs, prejudgment interest and such other and further relief as this Court deems just and proper.

## COUNT III- AIDING AND ABETTING TRESPASS

83.     The Association re-alleges paragraphs 1 through 67 as if fully set forth herein.

84.     HomeAway Users commit trespass by entering and using the Association's common elements and limited common elements without the permission of the Association.

85.     HomeAway had, and continues to have, actual knowledge that the Association does not allow or consent to HomeAway's short term rentals of units at the Opera Tower Condominium.

86.     HomeAway provides an array of services and guarantees to substantially assist Users in trespassing on to the Association's common elements and limited common elements.

87.     As a direct and proximate result of HomeAway's conduct, the Association has been damaged, including without limitation, in the amount of the reasonable rental value of the units rented through the Vrbo website or tablet application, the amount of the benefits received by HomeAway as a result of the illegal short term rentals, property damage to the Association's common elements and limited common elements, costs of providing additional security and monitoring for short term rental activities, legal fees and reputational damage to the Opera Tower Condominium, and exposure to potential penalties and per diem interest for violations of Miami 21.

88.     HomeAway's actions are intentional, willful, wanton, malicious, and performed with a reckless disregard for the Association's rights.

WHEREFORE, the Association demands judgment in its favor and against the Defendants for damages, costs, prejudgment interest, and such other and further relief as this Court deems just and proper

## COUNT IV- FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT- INJUNCTIVE RELIEF

89.     The Association re-alleges paragraphs 1 through 67 as if fully stated herein.

90.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Sla. Stat. 501.201, et seq. prohibits unfair competition, unconscionable acts or practices and unfair or deceptive acts or practices.

91.     HomeAway has engaged in and continues to engage in unfair and deceptive acts or practices by:

a.     Intentionally brokering and profiting from illegal short term rentals;

b.     Intentionally assisting Members and Users to engage in illegal short term rentals, despite having actual notice that the Members are violating applicable law and that Users may not be granted access to the rented accommodations;

c.     Representing on its website and mobile application that it verifies personal profiles and listings when it makes no effort to verify the legality of its listings;

d.     Failing to inform Users that it does nothing to determine whether the Member has the legal authority to engage in short term rentals;

e.     Continuing to list units for short term rentals despite actual notice that it is illegal to do so; and

f.     Failing to inform Users that they may be denied access to short term accommodations where short term rentals are not allowed.

92.     The foregoing acts and practices are likely to deceive consumers acting reasonably under the circumstances. A reasonable User would reasonably rely upon HomeAway's representation that it verifies listings and that it would not broker a rental accommodation that it knows to be unlawful.

93.     No reasonable consumer would book accommodations if the consumer was advised that the accommodations were illegal and that access to the accommodations would be denied.

94.     These representations, omissions, and practices cause HomeAway's consumers to act to their detriment. HomeAway Users book short term accommodations that are illegal, subjecting them to being denied access to their accommodations, having to use subterfuge to gain access to same, or at a minimum, and being confronted by security, building management or the police.

95.     HomeAway's acts and practices are deceptive and unfair in that it profits handsomely off these illegal transactions while its Users are subject to enforcement against the illegal short term rentals.

96.     These acts and practices subject HomeAway's consumers and the general public to substantial injury, including, but not limited to:

a.     The denial of access to rented accommodations that were paid for by its consumers under the false premise that such accommodations were lawful;

b.     The deprivation of property owners' right to vet, monitor, and control the identity of building occupants;

c.     Subjecting the full time owners and residents of a property to live in a transient, hotel type environment that lowers their quality of life and subjects them to constant

disturbances, compromised safety, and overburdens the common areas in their community such as the lobby, elevators, parking garage and recreational facilities;

d.     Subjecting property owners to additional operating expenses, including, but not limited to, added security, off duty police, and additional wear and tear on building components; and

e.     Subjecting property owners to the enforcement actions, including fines and legal fees, from the governmental authority having jurisdiction over the illegal short term rentals.

97.     Pursuant to F.S. 501.211(1), "anyone aggrieved" by an unfair or deceptive act or practice "may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person wo has violated, is violating, or is otherwise likely to violate this part."

98.     The Association is aggrieved and damaged by HomeAway's unfair and deceptive business practices which have caused:

a.     property damage to the Association's common elements and limited common elements;

b.      the Association to incur the costs of providing additional security and monitoring for short term rental activities;

c.     reputational damage to the Opera Tower Condominium;

d.     diminished quality of life, exposure to confrontations, and compromised security for the Opera Tower Condominium's permanent residents and owners; and

e.     the Association to be exposed to potential penalties and per diem interest for violations of Miami 21.

99.     The harm suffered by the Association as a result of HomeAway's deceptive and unfair practices is related to the harm suffered by its consumers as both arise from HomeAway's intentional conduct in inducing and facilitating Users to book accommodations that are illegal despite HomeAway's actual knowledge that short term rentals are illegal.

100.    Unless HomeAway advises its Users that short term rentals at the Opera Tower Condominium are prohibited, Users are unable to avoid the harm caused by HomeAway's deceptive and unfair practices.

101.    HomeAway has benefitted from these business practices by collecting brokerage fees from illegal short term rentals.

102.    The harm to HomeAway's consumers, the Association and other similarly situated property owners, and to the general public outweighs the utility of HomeAway's policy and practices.

103.    HomeAway's consumers, the Association and other members of the general public harmed by these unfair and deceptive trade practices do not have an adequate remedy at law.

WHEREFORE, the Association demands injunctive relief and declaratory relief pursuant to F. S. 501.211(1),  together with reasonable attorneys' fees and court costs pursuant to F.S. 501.211(2).

## COUNT V – INJUNCTIVE RELIEF

104.    The Association re-alleges paragraphs 1 through 67 as if fully stated herein.

105.    This is an action for injunctive relief

106.    HomeAway engages in the systematic violation of Miami 21 by offering and booking units at the Opera Tower Condominium for short term rentals.

107.    HomeAway's business practices have subjected the Association to a cease and desist letter by the City of Miami, pursuant to which the Association was ordered to cease all short term rentals at the Opera Tower Condominium.

108.    The Association has brought this action against HomeAway in an attempt to comply with the City of Miami's cease and desist letter and to otherwise enforce the terms of the Declaration.

109.    As it is clear that short term rentals are not allowed at the Opera Tower Condominium, there is a substantial likelihood that the Association will prevail on the merits.

110.    There is a substantial threat that the Association will suffer irreparable injury unless the prohibitory injunction requested herein is granted. Specifically, the Association will be subject to fines, per diem interest and attorneys' fees arising from the City of Miami's code enforcement activities, as well as the harm its lawful residents will be subjected to from the unsafe living environment created by the short term rentals.

111.    As such, the threatened injury to the Association far outweighs any damage that may be caused to the Defendants who has no legal right to broker short term rentals or receive payment for sort term rentals at the Opera Tower Condominium.

112.    The Association does not have an adequate remedy at law and will suffer irreparable harm if the injunction is not issued. Specifically, the Association does not have the legal authority to remove the short term renters from the condominium property and the City of Miami Police has advised that it likewise does not have the legal authority to remove the short term renters once they have entered upon the property.

113.    The prohibitory injunction requested herein would not be adverse to the public interest and actually serves to protect the life, safety, and well-being of the Opera Tower

Condominium residents, Travelers, Association personnel and other persons who access the condominium property for other legal purposes.

114.     The Association has notified the Defendants in writing as to the Defendants' continuing and ongoing illegal business practices and the Defendants have refused to comply with the Association's demand to cease illegal short term rentals. Accordingly, the temporary injunction sought herein should be entered without further notice to the Defendants as they clearly have no intent in complying with terms and provision of Miami 21.

WHEREFORE, the Association demands issuance of a temporary injunction which: (a) prohibits HomeAway from accepting or entering into booking accommodations for short term rentals (rentals having a duration of less than 30 consecutive days) at the Opera Tower Condominium; (b) prohibits HomeAway Payments from processing payments for short term rentals at the Opera Tower Condominium; (c) orders HomeAway to advise Users that short term rentals at the Opera Tower Condominium are prohibited; and, thereafter, issuance of a final injunction be issued together with the such other relief tis Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

The Association demands a trial by jury on all issues so triable.

Dated this 18th day of April, 2022.

**BALOYRA LAW**
Attorneys for Plaintiff
**OPERA TOWER CONDOMINIUM**
**ASSOCIATION, INC.**
Suntrust Plaza
201 Alhambra Circle, Suite 501
Telephone: 305.442.4142
Facsimile: 305.442.4377

/s/*Jose L. Baloyra*
Jose L. Baloyra, Esq.
F.B.N.: 84603
Primary Email: JBaloyra@BaloyraLaw.com
Secondary Email: RCruz@BaloyraLaw.com

**VERIFICATION BY THE OPERA TOWER CONDOMINIUM ASSOCIATION, INC.**

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING COMPLAINT AND THE FACTS ALLEGED THEREIN ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

_____
Authorized Representative


STATE OF FLORIDA                    )

COUNTY OF MIAMI-DADE                )


The foregoing was acknowledged before me this __ day of _April_____, 2022, by _Leticia_ _Ruiz____, Authorized Representative of THE OPERA TOWER CONDOMINIUM ASSOCIATION, INC., who is personally known to me or produced __FDL__ as identification.

_____
Notary Public - State of Florida

ROSA M. CRUZ
Notary Public - State of Florida
Commission # HH 50842
My Comm. Expires Ju. 29, 2025
Bonded through National Notary Assn.

23

*Exhibit "A"*

CFN 2007R1215953
OR Bk 26127 Pgs 0872 - 998; (127pgs)
RECORDED 12/26/2007 11:04:12
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

This instrument prepared by or under the supervision of
(and after recording return to):

Kerry E. Rosenthal, Esq.
Rosenthal Rosenthal Rasco, LLC
2875 Northeast 191st Street, Suite 500
Aventura, Florida 33180

DECLARATION OF CONDOMINIUM

OF

OPERA TOWER, A CONDOMINIUM

Opera Tower, LLC, a Florida limited liability company, hereby declares:

I.      Introduction and Submission

1.1     Purpose.  The purpose of this Declaration is to submit the Land and improvements described to Condominium form of ownership and use in the manner provided in Chapter 718 of the Florida Statutes, herein called the Condominium Act. Except where permissive variances therefrom appear in this Declaration, the annexed By-Laws and/or the Articles of Incorporation of OPERA TOWER CONDOMINIUM ASSOCIATION, INC., a Florida not-for-profit corporation, or in lawful amendments to these instruments, the provisions of Chapter 718, supra, including the definitions therein contained, are adopted herein by express reference as if set forth in full; and this Declaration, the annexed By-Laws, and the Articles of Incorporation of said Corporation, as lawfully amended from time to time, shall govern this Condominium and the rights, duties, and responsibilities of Owners of Condominium Parcels therein.

1.2     The Land.  The Developer owns the fee title to certain land located in Miami-Dade County, Florida, as more particularly described in Exhibit "A" annexed hereto (the Land").

1.3     Submission Statement.  Except as set forth in this paragraph, the Developer hereby submits the Land and all improvements erected or to be erected thereon and all other property, real, personal or mixed, now or hereafter situated on or within the Land - but excluding all public or private (e.g. cable television) utility installations and all leased property therein or thereon - to the condominium form of ownership and use in the manner provided for in the Florida Condominium Act as it exists on the date hereof and as it may be hereafter renumbered. Without limiting any of the foregoing, no property, real, personal or mixed, not located within or upon the Land as aforesaid shall for any purposes be deemed part of the Condominium or be subject to the jurisdiction of the Association, the operation and effect of the Florida Condominium Act or any rules or regulations promulgated pursuant thereto, unless expressly provided.

1.4     Name.  The name by which this condominium is to be identified is OPERA TOWER, A CONDOMINIUM (hereinafter called the "Condominium").

2.      Definitions.  The following terms when used in this Declaration and in its exhibits, and as it and they may hereafter be amended, shall have the respective meanings ascribed to them in this Section, except where the context clearly indicates a different meaning:

2.1     "Act" means the Florida Condominium Act (Chapter 718 of the Florida Statutes) as it exists on the date hereof and as it may be hereafter renumbered.

2.2     "Articles" or "Articles of Incorporation" mean the Articles of Incorporation of the Association, as amended from time to time.

2.3     "Assessment" means a share of the funds required for the payment of Common Expenses which from time to time is assessed against the Unit Owner.

2.4     "Association" or "Condominium Association" means OPERA TOWER CONDOMINIUM ASSOCIATION, INC, a Florida corporation not for profit, the sole entity responsible for the operation of the Condominium.

2.5     "Association Property" means that property, real and personal, which is owned or leased by, or is dedicated by a recorded plat to, the Association for the use and benefit of its members.

2.6     "Board" or "Board of Directors" means the board of directors, from time to time, of the Association.

2.7     "Building" means the structure(s) in which the Units and the Common Elements are located, regardless of the number of such structures, which are located on the Condominium Property.

2.8     "Bulk Agreement" means any bulk agreement made by Developer or the Association and an unrelated cable, satellite, internet and/or telephone company, providing for a master cable TV, satellite TV, internet and/or telephone service throughout the Building.

2.9     "By-Laws" mean the By-Laws of the Association, as amended from time to time.

Owners, including Owners who will not continue after the taking, in proportion to the applicable percentage shares of such Owners as they exist prior to the adjustments to such shares effected pursuant hereto by reason of the taking.

15.6 _Taking of Common Elements._ Awards for the taking of Common Elements shall be used to render the remaining portion of the Common Elements usable in the manner approved by the Board of Directors of the Association; provided, that if the cost of such work shall exceed the balance of the funds from the awards for the taking, the work shall be approved in the manner elsewhere required for capital improvements to the Common Elements. The balance of the awards for the taking of Common Elements, if any, shall be distributed to the Unit Owners in the shares in which they own the Common Elements after adjustments to these shares effected pursuant hereto by reason of the taking. If there is a mortgage on a Unit, the distribution shall be paid jointly to the Owner and the mortgagees of the Unit.

15.7 _Amendment of Declaration._ The changes in Units, in the Common Elements and in the ownership of the Common Elements and share in the Common Expenses and Common Surplus that are effected by the taking shall be evidenced by an amendment to this Declaration of Condominium that is only required to be approved by, and executed upon the direction of, a majority of all Directors of the Association and a unanimous vote of the owners of Commercial Units.

16. _Occupancy and Use Restrictions._ In order to provide for congenial occupancy of the Condominium and Association Property and for the protection of the values of the Units, the use of the Condominium Property shall be restricted to and shall be in accordance with the following provisions:

16.1 _Occupancy._ Each Residential Unit shall be used in accordance with all applicable county and state zoning codes, ordinances and regulations. The Commercial Units may be used for any lawful purpose, and may be used by the Owner(s) thereof and its/their guests, tenants and invitees. Without limiting the generality of the foregoing, it is intended (without in any way limiting the permitted uses) that Commercial Unit 20 (and the roof surfaces immediately adjacent thereto, which shall be Limited Common Elements) may be used, among other things, to house commercial mechanical equipment, antennas, dishes, receiving, transmitting, monitoring and/or other equipment or items. The provisions of this subsection 16.1 shall not be applicable to Units used by the Developer for model apartments, sales offices, management services, repairs, maintenance or construction.

16.2 _Children._ Children shall be permitted to be occupants of Units.

16.3 _Pet Restrictions._ One or two domesticated dogs and/or domesticated cats, up to a total aggregate weight of fifty (50) pounds, may be kept in a Residential Unit by a Residential Unit Owner at any time. Any pet permitted hereunder shall only be allowed to remain in the Residential Unit and at the Condominium Property if such pet is (a) permitted to be so kept by applicable laws and regulations, (b) not left unattended on balconies or in lanai areas, (c) generally, not a nuisance to residents of other Units and sufficiently under control at all times; (d) not a pit bull or other breed considered to be dangerous by the Board of Directors; and provided: (a) Unit Owners shall pick up all solid wastes from their pets and dispose of the same appropriately; and (b) that neither the Board nor the Association shall be liable for any personal injury, death or property damage resulting from a violation of the foregoing and any occupant of a Unit committing such a violation shall fully indemnify and hold harmless the Board of Directors, the Developer, each Unit Owner and the Association in such regard. Any landscaping damage or other damage to the Common Elements caused by a Unit Owner's pet must be promptly repaired by the Unit Owner. The Association retains the right to effect said repairs and charge the Unit Owner therefor.

16.4 _Alterations._ Any and all alterations shall be subject to the restrictions and limitations set forth in Section 9 above, including, without limitation, the requirements for Board approval. Additionally, curtains, blinds, shutters, levelors, or drapes (or linings thereof) which face the exterior windows or glass doors of Residential Units shall be white or off-white in color and shall be subject to disapproval by the Association, in which case they shall be removed and replaced with acceptable items.

The foregoing shall specifically not apply to the owners of the Commercial Units. Specifically, the Owner of any Commercial Unit is expressly permitted (without requiring consent from the Association or any Unit Owner or any other party, other than applicable governmental authorities to the extent that prior approval from them is required), to install on the exterior walls of such Owner's Commercial Unit and any Limited Common Element or Common Elements balconies, decks or other areas appurtenant thereto such signage, mechanical equipment, antennas, dishes, receiving, transmitting, monitoring and/or other equipment thereon as it may desire and may further make any alterations or improvements, in the Commercial Unit Owner's sole discretion, to such Commercial Unit, Limited Common Elements or Common Elements. Any improvements and/or alterations made by any Commercial Unit Owner, must however comply with all applicable governmental codes, ordinances and/or regulations.

16.5 _Use of Common Elements and Association Property._ The Common Elements and Association Property shall be used only for furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of Units. In that regard, each Unit Owner, by acceptance of a deed for a Unit, thereby covenants and agrees that it is the intention of the Developer that the stairwells of the Building are intended for ingress and egress in the event of emergency only, and as such are constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. Similarly,

*Exhibit "B"*

AMENDED RULES AND REGULATIONS

FOR

OPERA TOWER CONDOMINIUM ASSOCIATION, INC.

These Amended Rules and Regulations ("Rules and Regulations") hereinafter enumerated as to the personal property of the Association, the Condominium Property, the individual Units, Limited Common Elements, Common Elements, and the Association in general shall be deemed in effect until further amended by the Board of Directors and shall apply to and be binding upon all Unit Owners. The Unit Owners and occupants shall at all times obey said Rules and Regulations and shall use their best efforts to see that they are faithfully observed by their families, guests, invitees, servants, lessees, persons for whom they are responsible and persons over whom they exercise control and supervision. Violations of these Rules and Regulations may subject the violator to any and all remedies available to the Association and other Unit Owners pursuant to the terms of the Declaration, the Articles of Incorporation, the By-Laws, these Rules and Regulations and Florida law. Violations may be remedied by the Association by injunction, fines or other legal means and the Association shall be entitled to recover in said actions any and all court costs incurred by it, together with reasonable attorneys' fees in addition to any remedies or rights which the Association or any Unit Owner may have to recover damages, costs and attorneys' fees against any person violating the Rules and Regulations or the Declaration and any of the exhibits thereto. The Board of Directors may, from time to time, adopt or amend previously adopted Rules and Regulations covering the details of the operation, use, maintenance, management and control of the Condominium Property, Units, Limited Common Elements, and Common Elements and any facilities or services made available to the Unit Owners. In an effort to promote the health, happiness and peace of mind of all Unit Owners and to maximize the enjoyment of the premises and the protection of its value, it is imperative that Unit Owners and occupants, as well as their family, guests and lessees, abide by the terms of the Declaration, By-Laws and Rules and Regulations, as presently existing and as may be adopted or amended in the future. In view of the close proximity in which Unit Owners reside and use the Condominium Property, the failure to comply with the terms of the Declaration, By-Laws and Rules and Regulations infringes on the rights of all other Unit Owners. In addition to the rights and powers given to the Board of Directors by the Declaration, Articles of Incorporation, By-Laws and Florida law, the Board of Directors is further empowered, authorized, and instructed to see that these Rules and Regulations and/or any amendments or additions to these Rules and Regulations, are reasonably and equitably enforced.

THE RULES AND REGULATIONS ARE AS FOLLOWS:

1.      USE OF COMMON ELEMENTS: The sidewalks, entrances, passages, lobbies, hallways, and similar portions of the Common Elements shall not be obstructed nor used for any other purpose other than for ingress and egress to and from the Condominium and Association Property. No Unit Owner, or their guest or invitee shall block the emergency exits at the Condominium. No carts, bicycles, scooters, carriages, chairs, tables or other similar objects shall be stored in the entranceways, passageways or vestibules, except in areas designated for such purposes. The Common Elements shall not be obstructed, littered, defaced, or misused in any manner. No person or persons shall be permitted to loiter or gather in any portion of the Common Elements (other than the pool, in accordance with these Rules and Regulations) where such gathering interferes with a Unit Owner's privacy or quiet enjoyment of his or her Unit. The foregoing shall not,

1

however, be applicable to the Commercial Units. As set forth in the Declaration, the Owner(s) of the Commercial Units shall be permitted to make use of the sidewalks, entrances, passages, and other portion of Common Elements adjacent to its Unit to further the commercial uses from its Commercial Unit. The use of and access to the Common Elements and Association Property is further subject to the following rules and regulations:

2. RECREATIONAL AND OTHER COMMONLY USED FACILITIES:  The Recreational and Other Commonly Used Facilities are for the exclusive use of Unit Owners and their, lessees, invitees, and guests. Any damage to the Recreational and other Commonly Used Facilities or equipment caused by any Unit Owner, his guests, family, lessees, or invitees shall be repaired at the Unit Owner's expense.

3. SWIMMING POOL & SPA:

The Pool & Spa hours are strictly from sunrise to sunset per Health Department. Proper bathing attire must be worn at all times. No topless bathing is permitted at any time.  Residents are limited to two (2) pool guests at a time during the day. Residents must stay with their guests and are responsible for their behavior. Shoes and shirts or proper cover-ups must be worn in lobby & the inside common areas at all times. Bathing attire is not allowed in the building.  Children under the age of 15 at the pool must be accompanied by an adult at all times.  There is no lifeguard is on duty at the pool. The Association is not responsible for any losses, injuries, or accidents. Running, pushing or other horseplay, use of raft, tubes, balls etc. is not permitted in the pool area. Nuisances of any kind will not be permitted on the pool deck. Violation of this rule after initial warning will result in a fine and removal of pool privileges for remainder of the day/night.  Headphones must be used with radios/stereos at all times to avoid breaking the nuisance policy.  Legal action will be taken against any person who misuses pool Life Safety Equipment.  Drinks are permitted in plastic containers or cans only. No glass or other breakable objects will be permitted in the pool area at any time, for any reason.  No drinking, eating or smoking is permitted in the pool or Spa at any time. No smoking is permitted on the pool decks at any time.  When the pool area is crowded, chairs & tables may not be reserved.  Infants or toddlers must wear proper swimming attire and plastic cover diapers at all times.

4. RECREATION ROOM RENTAL & INDIVIDUAL USE: Recreation Room hours are from 9:00 am to 11:00 pm daily.  The Recreation Room will be rented to residents only. (Details provided in the Management office).  All reservations must be made at least one (1) week in advance.  Reservations must be made for parties only and not for individual or small group use. The Board of Directors shall have discretion in determining if any request to use the Recreation Room meets this criteria. The Recreation Room will be rented only once per day. The Recreation Room will not be rented on holidays or for holiday weekends. A  $500.00deposit in the form of a cashier's check or money order must be made before the Recreation Room can be rented. The security deposit shall be returned if the Association confirms that no damage took place. Any damage done to the Recreation Room will be the unit owner's responsibility.  When the Recreation Room is rented, alcohol may not be consumed outside the Recreation Room area.  A non-refundable $200 cleanup fee, payable in advance, will be charged for the cleaning of the Recreation Room. The renter must dispose of all food and party supplies at the end of party.  A security guard must be present on site at the party at all times until completion of the event. Security guards must be obtained through Association's security company at the then prevailing hourly rate including

2

all minimum hourly charges by the security company. If the guard is asked to stay longer than the anticipated time, the extra coverage will be taken out of the Security Deposit. Residents may have no more than sixty (60) guests at a time in the Recreation Room, and will be held responsible for their guest actions.   Appropriate attire and shoes are required at all times. No food or drinks are permitted in the Recreation Room at any time unless it is rented out by Management.  No sleeping will be permitted in the Recreation Room.  Residents may not touch stereo equipment at any time. (Please ask Management or security for assistance).

5. SAUNA / FITNESS ROOM: Sauna and Fitness Room hours are from 6 am to 11 pm every day.  Smoking, food or beverages, besides bottled water is not permitted in the exercise room. Residents whose occupation is personal training may not use the Fitness Room as a business by bringing in outside guests into the building. This causes a liability on the association and Fitness Room privileges will be revoked immediately if caught.  Residents must leave equipment in its proper place. Equipment may not be removed from the exercise room.  Exercise equipment cannot be reserved.  Proper exercise attire must be worn at all times.  Towels must be used on Fitness Room equipment at all times. Fitness Room equipment must be wiped down after use. No one under the age of 15 is permitted in the Fitness Room/Sauna without adult supervision. The Association is NOT responsible for any Fitness Room/Sauna related losses, injuries, or accidents. All personal trainers must be licensed and insured. All weights must be put back in their designated place/area.  Kick boxing, jump roping, slams, or wall climbs or other forms of calisthenics are not permitted in the Fitness Room.. Dropping of any weights on the Fitness Room floor, banging of cable tension weights or misuse of equipment is strictly prohibited.

6. RESERVATION AND USE OF BARBECUES: All residents must reserve grill with front desk security prior to use of same. The use of the barbecues is subject to the following:

a.      4 hour time slot per reservation.

b.      1 unit permitted per grill, 2 grills may not be booked at the same time.

c.      Grills may be used from 9 a.m until dusk daily.

d.      Applicable fees and deposits are required.

e.      Guests may not reserve BBQ grills, only Owners and Renters of record can make a reservation.

f.      Guest list must be provided to the front desk security prior to using the BBQ grill

g.      Owner / Renter may have up to 5 guests in the BBQ area.  Guest must wear a wrist band provided by management.

h.      Boom boxes, speakers and/or any other devices that operate without head phones are not allowed.

i.      Beverages consumed must be in a closed plastic container no glass allowed.

j.      No smoking.

k.      No pets.

l.      Residents are fully responsible for their guests at all times.

m.     Association is not responsible for any personal items lost or stolen.

n.      Residents are fully responsible for any damages caused to property furniture or grill.

o.      No building property or furniture shall be removed from BBQ area.

p.      Persons under 15 years of age must be accompanied by an adult.

7.  BUILDING & PARKING ACCESS:

a.      Each Unit Owner will be provided one fob for each adult residing at the unit.

b.      Front Desk will not receive or hold unit keys, fobs or parking decals under any circumstances.

c.      No guests, realtors, housekeepers, delivery people or contractors will be granted access to a floor, stairs, or unit at any time unless a prior authorization from Resident to Management Office or Front Desk is received and all must provide a picture identification.

d.      No unit keys, fobs, or parking  decals will be given to guests, realtors, housekeepers, delivery people or contractor at any time. Unit owners must provide ALL access at ALL times.

e.      Realtors must provide a Real Estate Contract or listing agreement for a specific unit and proper identification before access to a unit is given.

f.      In regard to New Owners, keys & fobs will not be given to anyone other than the unit owner without a Power of Attorney.

g.      Fobs found with unauthorized people/guests/residents will automatically be deactivated.

h.      Each Registered Resident is given one (1) building fob.

i.      Residents MUST have Fobs & Photo ID's at all times when using Common  Areas.

j.      Fobs MUST be used to access all entrances and the garage. Failure to carry Fob which requires front desk to open doors will result in warning, and require Resident to present Identification. Fobs used by anyone other than the Resident shall be immediately deactivated.

k.      Fobs shall not be pirated or duplicated by any knock off service.

l.      Each unit is given one (1) Parking Decal. If lost, a Registered Resident can purchase a new decal for an additional cost of $50.00 each.

## 8. REGISTRATION OF TENANTS

a.      Prior to occupancy, all Tenants must submit an application to the Association, the Association must receive a completed tenant application package along with the related fees and deposits. The approval will take a minimum of 10 business days. Upon tenant approval, the tenant must attend a building orientation with a representative of the Association. Upon completion of orientation the tenant can then schedule to use the service elevator for moving purposes.

b.      Upon expiration of a lease, a new lease agreement or renewal of the existing lease agreement will be required. Until such time as a new lease agreement or renewal are provided to the Association, all access devices such as fobs and access cards shall be deactivated.

c.      All Tenants must obtain renters insurance/HO6 coverage naming the Association as an additional insured interest.

d.      The elevator is scheduled on a first come first serve basis.

e.      Association MUST be provided with a copy of a fully executed lease.

f.      The unit owner shall have NO right to lease his unit if at the commencement of the lease; the unit owner is delinquent in the payment of Assessments to the Association or has an outstanding tine.

g.      In accordance with City of Miami Zoning regulations, no lease shall be for a period of LESS than thirty (30) days.  Unit Owners and Tenants may not list units for short term rental (less than 30 days) at any online platform including but not limited to airbnb.com, vrbo.com, booking.com, tripadvisor.com, hotels.com.

h.      If a unit owner or Tenant subleases a unit for a period of LESS THEN 30 DAYS  fobs will be immediately deactivated.

i.      Association MUST be provided a completed Association application, including $100 application fee per Resident.

j.      Association MUST be provided with an Association Lease Addendum signed by both Owner & Tenant. The Addendum will provide for the Tenant's acceptance of these Rules and Regulations and the terms and provision of the Declaration of Condominium.

k.      If an owner is NOT occupying their unit themselves and has a guest, family or friends occupying their unit RENT FREE for less than 30 days, the guest, family or friend must complete the Association application, including $100 application fee per person.

5

l.       If Tenant/Owner has pets, the Association MUST be provided with a completed Pet Registration form, proof of pet breed, vaccination records and a $100.00 registration fee. All pets must comply with the provisions of the Declaration of Condominium and are subject to being weighed by management.

9. GUESTS REGISTRATION

a.       If a Resident has a Guest staying with them in their unit for less than 30 days and can NOT be with them at all times to access the lobby doors and elevators, they MUST complete a Guest Registration Form.

b.       Registered Residents MUST be present with Management when completing Guest Registration Form.

c.       With the exception of exiting & entering the building, Guests MUST be with Registered Residents at ALL times throughout building & Common Areas. Failure to comply with this Rule will result in loss of deposit.

d.       If Guest will be staying longer than anticipated (No More the 30 Days), the Registered Resident must notify Management in person as soon as possible.

e.       Guests found using a Registered Residents Fob will cause automatic deactivation of the Fob.

10. ALTERATIONS AND/OR STRUCTURAL MODIFICATIONS: No Unit Owner shall make, cause to be made or allow to be made any alteration and/or structural modification to his improved Unit or to the Limited Common Elements, or Common Elements without the prior written consent of the Board of Directors. Any such alteration or modification made without the consent of the Board of Directors, in writing, is subject to removal, without notice, and at the cost of the Unit Owner who make or cause to be made, such alteration or modification, or for whose benefit the alteration or modification was made. All construction pertaining to units must be done Monday through Friday, 8AM-5:00PM. NO construction will be permitted on Weekends or Holidays. Contractors must provide a completed construction package with work permits, proof of liability insurance, worker's compensation coverage and a construction deposit before access is granted to a unit or deliveries are made. All contractors and their worker must register at the front desk and provide identification prior to entry.

11. EXTERIOR APPEARANCE: No improvement may be constructed upon any part of the Common Elements or the exterior of the Units or its Limited Common Elements without the prior written consent of the Board of Directors. The exterior of the Units, including but not limited to balconies, shall not be screened, enclosed, painted, or otherwise modified in any manner without the prior written consent of the Board of Directors, and such consent may be withheld on purely aesthetic grounds, within the sale discretion of the Board of Directors. Unit Owners are prohibited from installing, placing, mounting, or attaching satellite dishes on the exterior of the Condominium. Notwithstanding the foregoing, one portable removable United States flags and other types of United States military flags may be displayed in a respectful way in accordance with

6

Section 718.113(4) of the Florida Statutes. These restrictions shall not apply to the Commercial Units. No Unit shall have any aluminum foil placed in any window or glass door or any reflective or tinted substance placed on any glass, unless approved, in advance by the Board of Directors in writing. No unsightly materials may be placed on any window or glass door or be visible through such window or glass door.

12. ANTENNA AND WIRING: No radio, television, electrical, lighting or air conditioning installation or other wiring shall be made without the written consent of the Board of Directors, at the Board's sole discretion for aesthetic grounds. Any aerial, wiring, or antenna erected or installed on the balcony, or exterior walls of Units without the consent of the Board of Directors, in writing, is subject to removal, without notice, and at the cost of the Unit Owner for whose benefit the installation was made.

13. DAMAGED COMMON ELEMENTS: Damage to the Condominium Property or its improvements, including but not limited to the Common Elements, caused by any Unit Owner or his lessees, guests or invitees shall be the sole responsibility of such Unit Owner.

14. WINDOW, DOOR AND BALCONY TREATMENTS: Door and window coverings visible from the exterior of the Unit shall be subject to disapproval of the Board of Directors. No awning, canopy, shutter or other projection shall be attached to or placed upon the balcony or outside walls or doors of the Units without the prior written consent of the Board of Directors. No blinds, shades, screens, decorative panels, window or door coverings shall be attached to or hung or used in connection with any window or door in a Unit, if affixed to the exterior of a Unit, without the prior written consent of the Board of Directors. No clothesline or similar device shall be permitted on any portion of the Limited Common Elements, or Common Elements. The Commercial Units shall be exempt from this provision. Owners are responsible to maintain their own exterior doors and door surroundings. Blinds, curtains or drapes (or lining thereof) which face on exterior windows or glass doors must be white or off-white in color. Window treatments not meeting these requirements must be removed. The Board may determine at its own discretion the approval or disapproval of "offwhite." Bed sheets, aluminum foil, or linens may not be used as curtains.

15. FLAMMABLE MATERIALS: No flammable, combustible or explosive fluid, chemical or substance, shall be kept in or on any Unit, Limited Common Element or Common Element.

16. HURRICANE PREPARATIONS: Each Unit Owner who plans to be absent from his Unit during the hurricane season must prepare his Unit prior to his departure by removing all furniture, plants and other objects from his balcony and taking such other actions as may be reasonably necessary to secure the Unit and the Unit Owner's Property, including but not limited to, providing the Association with the name of a responsible individual or company to contact in the event of a hurricane. Any Unit Owner failing to make hurricane preparations and/or making improper preparations shall be held responsible for any damage done to the property of other Unit Owners, and/or to the Common Elements resulting from such failure.

17. HURRICANE SHUTTERS: The Board of Directors shall, from time to time, establish hurricane shutter specifications which comply with the applicable building code, and establish permitted colors, styles and materials for hurricane shutters. The Condominium Association shall

approve the installation or replacement of hurricane shutters conforming with the Board's specifications. The Board may, with the approval of a majority of voting interests in the Condominium, install hurricane shutters, and may (without requiring approval of the membership) maintain, repair or replace such approved shutters, whether on or within Common Elements, Limited Common Elements, Units or Association Property; provided, however, that if laminated glass, in accordance with all applicable building codes and standards, architecturally designed to serve as hurricane protection, is installed, the Board may not install hurricane shutters in accordance with this provision. All shutters shall remain open unless and until a storm watch or storm warning is announced by the National Weather Center or other recognized weather forecaster. A Unit Owner or occupant who plans to be absent during the hurricane season must prepare his Unit prior to his departure by designating a responsible firm or individual to care for his Unit should a hurricane threaten the Unit or should the Unit suffer hurricane damage, and furnishing the Condominium Association with the name(s) of such firm or individual. Such firm or individual shall be subject to the approval of the Condominium Association.

18. DELIVERIES: The Association shall not be responsible for the theft, conversion, disappearance, loss or damage of any item received from or for a Unit Owner, even though such theft, conversion, disappearance, loss or damage may occur through the negligence or willful act of the employees of the Association, and all parties delivering items to such employees and all parties intended to be the recipient of items so delivered, hereby assume all risks of theft, conversion, disappearance, loss and damage of and to such items.

19. All moving & deliveries pertaining to units must be done Monday-Friday 8AM – 5:00PM. NO moving or deliveries will be permitted on Saturdays, Sundays, after permitted hours or on Holidays. A $500 deposit is required for all move in/move out and deliveries. An elevator reservation fee of $100.00 is required for any move in/move out. Elevator reservations are limited to a three (3) hour time slot per reservation.

Large boxes or items that do not fit on valet cart must go through receiving area and service elevator must be used. An elevator reservation and deposit will be required pursuant to these Rules and Regulations.

20. DEVELOPER'S EMPLOYEES. CONTRACTORS AND ASSOCIATION'S EMPLOYEES: No Unit Owner or member of his family or guest shall give orders or instructions to the Developer's or the Association's agents or employees, but rather shall express his desires to the person designated for this purpose by the Board of Directors.

21. INSURANCE RATES: No Unit Owner shall permit or suffer anything to be done or kept in his Unit which will increase the rate of insurance on the Common Elements.

22. PERSONAL PROPERTY: The personal property of a Unit Owner shall be stored within his Unit and in no event shall such property be stored or left within or upon other portions of the Common Elements. No personal property items or discarded furniture may be left on the stairways, hallways, corridors or trash chute rooms. No decorations or floor mats are permitted in the hallways & corridors unless approved by the Board of Directors

23. BALCONIES: No articles of personal property (including bicycles and scooters) except suitable patio furniture, plants and planters shall be placed on balconies, courtyards or similar areas. Balconies shall not be hosed down in a manner to cause water runoff. No linens, towels, clothing shall be shaken or hung from the balconies. No mops or rugs shall be shaken from the windows or doors. No loose articles shall be left on balconies during the hurricane season. No cooking shall be permitted on any balcony. No barbecues or propane tanks shall be stored or placed on the balconies. Unit owners shall not allow anything to be thrown or to fall from the balconies. No balconies (or any portion thereof) may be enclosed or screened without the prior written consent of the Board of Directors of the Association.

24. NUISANCES: No Unit Owner shall make or permit any disturbing noises any place upon the Unit, Limited Common Elements or Common Elements by himself, his family, household employees, agents, visitors or licensees, nor do or permit anything by such persons that will interfere with the rights, comforts or convenience of other Unit Owners. No Unit Owner shall play or operate any television, radio, appliance, device, musical instrument or other sound equipment, in such manner that same would disturb or annoy other Unit Owners. The owners of Commercial Units shall be exempt from this provision.

25. SOLICITATIONS: There shall be no solicitation permitted by any persons, anywhere in or about the Common Elements for any cause, charity or for any purpose whatsoever, unless specifically authorized in advance by the Board of Directors.

26. CHILDREN: Each Unit Owner shall be solely responsible for the actions and the actual cost for any damage caused by his children or his visiting children. Playing shall not be permitted in any of the hallways, stairways, elevators and lobby areas, and loud noises will not be tolerated. Unit Owners shall be responsible for and shall require their children and visiting children to comply with all rules and regulations. All children under twelve must be accompanied by an adult in the Recreational Areas.

27. GUEST OCCUPANCY: Any and all guests of Unit Owners shall be required to comply with all rules, regulations, rights and obligations created by the Declaration and its exhibits.

27. PETS: One or two domesticated dogs and/or domesticated cats, up to a total aggregate weight of fifty (50) pounds, may be kept in a Residential Unit by a Residential Unit Owner at any time. Any pet permitted hereunder shall only be allowed to remain in the Residential Unit and at the Condominium Property if such pet is (a) permitted to be so kept by applicable laws and regulations; (b) be kept on a leash not more than six (6) feet long when outside of a unit; (c) not left unattended on balconies or in lanai areas, (d) generally, not nuisance to residents of other Units and sufficiently under control at all times; (e) not a pit bull or other breed considered to be dangerous by the Board of Directors; (e) unruly or aggressive dogs must be muzzled; and provided: (i) Unit Owners shall pick up all solid wastes from their pets and dispose of the same appropriately; and (ii) that neither the Board nor the Association shall be liable for any personal injury, death or property damage resulting from a violation of the foregoing and any occupant of a Unit committing such a violation shall fully indemnify and hold harmless the Board of Directors, each Unit Owner and the Association in such regard. Any landscaping damage or other damage to the Common Elements caused by a Unit Owner's pet must be promptly repaired by the Unit Owner, The Association

9

retains the right to effect said repairs and charge the Unit Owner therefor. In no event shall dogs ever be allowed to be walked or taken on/in any recreational facilities within the Condominium Property. In no event shall dogs ever be allowed to taken in the pool. In no event shall pets be taken to common areas that are not easements or walkways/passages to the exterior of the property. They must not be walked in exterior common areas such as loading areas, employee parking lot, and building landscape areas. Guests with service pets should arrive with the service vest on the pet and the proper documentation to present to front desk

28. SIGNS: No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by any Unit Owner on any part of the Unit which can be seen from the Common Elements or another Unit, or upon any portion or part of the Condominium Property without the prior written consent of the Board of Directors. The Commercial Units and the owners of Commercial Units shall be exempt from this provision.

29. EMERGENCY ENTRY: In case of any emergency originating in or threatening any Unit, regardless of whether the Unit Owner is present, the Board of Directors of the Association or any other person authorized by it, or any management firm, shall have the right to enter such Unit for the purpose of remedying or abating the cause of such emergency.

30. EXTERIOR LIGHTING: To maintain a uniform and pleasing appearance within the Condominium Property, no exterior lighting shall be permitted on balconies or anywhere else within a Unit, Limited Common Elements, or Common Elements, unless first approved, in writing, by the Board of Directors.

31. ASSOCIATION EMPLOYEES. Employees of the Association are not to be engaged by Unit Owners for personal errands which are not within the scope of the applicable employee's duties.

32. ROOF. Owners of Residential Units, their lessees, families, and guests are not permitted on the roof for any purpose whatsoever.

33. AIR CONDITIONING UNIT.
No air-conditioning unit may be installed by Unit Owners or occupants without the prior written consent of the Board of Directors. No air-conditioning units shall be installed in/on any window.

34. TRASH CHUTE; GARBABE AND TRASH DISPOSAL; CLEANLINESS. Use of the trash chutes is strictly limited to between the hours of 7AM and 11PM.  Items must be bagged before placing them in the trash chute. Only perishable items or small items can be disposed of in the trash chute. No household goods, appliances, furniture or other items may be disposed of in the trash chute as they will damage the chute and result in a costly. Recyclable Items, such as plastic bottles and containers, tin, aluminum and steel cans, glass bottles and jars, cardboard boxes, newspapers, paper bags and note paper must be disposed of in receptacles made available in the service elevator area on the first floor to be used in accordance with instructions given to all residents/owners by the Association. Large items must be broken down and placed in the recycling area on the first floor after first advising the Association. The Association may charge a trash removal fee of $500.00 for any such items and may deduct this fee from the deposit provided for a move in/move out/delivery.

35.  LIABILITY INSURANCE. All owners must carry liability insurance coverage through an HO6 or other similar policy. Such insurance coverage shall be for not less than $100,000 per occurrence and name the Association as an additional insured interest.

36.     MISCELLANEOUS

a.     Mandated by City of Miami Code Enforcement:  no loud music or noise will be permitted after 11:00PM.

b.     No one under the legal age drinking age may consume alcoholic beverages on the Condominium property at any time.

c.     No flammable, combustible or explosive fluids, chemicals or substances shall be kept in units or common areas at any time. A Unit Owner/Tenant who plans on being absent during the hurricane season must notify Management with contact information in the event hurricane damage is caused to their unit.

d.     Employees of the Association are not to be sent out by unit, owners or occupants for personal errands. Management shall be solely responsible for directing and supervising employees of the Association.

e.     No unit owner or occupant shall make or permit any disturbing noises by himself or his family, servants, employees, pets, agents, visitors or licensees, nor operate or permit to be operated a phonograph, television, radio or sound amplifier in his unit in such a manner as to disturb or annoy other residents.

f.     No unit owner or occupant shall conduct, nor permit to be conducted, vocal or instrumental instruction at any time which disturbs other residents.

g.     No unauthorized posting of any kind in elevators, mailroom or any other common area is permitted. Authorization is granted by a majority vote by the Board of Directors.

h.     No laptop use is permitted in the lobbies.

i.     Valet carts may not be used for scheduled move in or move outs.

j.     No smoking is permitted anywhere in the building, including pool decks, Recreation Room, hallways, lobbies & stairways.

k.     Smokers who habitually smoke cigarettes outside their unit must use ashtrays and not liter the area with cigarette butts.

37. VIOLATIONS.

Upon a determination by the Board of Directors that a violation has occurred, the Board of Directors shall notify the Unit Owner, in writing, of the alleged violation or violations for which said Unit Owner is responsible and the amount of any fine due in connection therewith.

The Association may levy reasonable fines against a Unit Owner, or its occupant, licensee, or invitee, for his/her failure to comply with any provision of the Declaration, the By-Laws, or the Rules and Regulations, after a hearing, as set forth hereinabove. No fine levied by the Association shall become a lien against a Unit. No fine may exceed $100.00 per violation. However, a fine may be levied on the basis of each day of a continuing violation, with a single notice and opportunity for hearing, provided that no such fine shall in the aggregate exceed $1,000.00. Unpaid fines, pursuant to these Rules and Regulations, shall not constitute a lien on said Unit Owner's Unit or Units. The Board of Directors may bring suit to recover a money judgment for any fines required to be paid to the Association.

Based on mitigating facts and circumstances, the Board of Directors shall have the authority to totally excuse or reduce the amount of the fine established for a violation. The Unit Owner shall be responsible at all times for his family and guests, as well as for his lessees and sub-lessees and their family and guests. Lack of knowledge of the terms of the Declaration, By-Laws and Rules and Regulations shall not constitute a mitigating circumstance hereunder.

Prompt and sufficient notice shall be deemed to have been given to any Unit Owner alleged to be in violation of any rule or regulation by a letter deposited in the United States Mail, addressed to the Unit Owner at his post office address as it appears on the records of the Association, the postage thereon prepaid. The party alleged to have committed a violation of the Declaration, By-Laws, or Rules and Regulations shall be afforded an opportunity for hearing after reasonable notice of not less than fourteen (14) days and said notice shall include (I) A statement of the date, time and place of the hearing; (2) A statement of the provisions of the Declaration, Association By-laws, or Association Rules and Regulations which have allegedly been violated; and (3) A short and plain statement of the matters asserted by the Association. The party alleged to have committed such violation shall have an opportunity to respond, to present evidence, and to provide written and oral argument on all issues involved and shall have an opportunity at the hearing to review, challenge, and respond to any material considered by the Association.
.

38. These Rules and Regulations shall be cumulative with the covenants, conditions, and restrictions set forth in the Declaration of Condominium, provided that the provisions of same shall control over these rules and regulations in the event of a conflict or a doubt as to whether a specific practice or activity is permitted or is not permitted. These Rules and Regulations shall not apply to the Developer, nor its agents or employees and contractors, nor to the Units owned by the Developer. The Board of Directors shall be permitted, but not required, to grant relief to one or more Unit Owners from specific rules and regulations upon written request therefore and good cause shown in the opinion of the Board of Directors.

38. These Rules and Regulations may be modified or supplemented by the Board of Directors.

12

Adopted and approved this __ day of _____, 2020.

OPERA TOWER CONDOMINIUM ASSOCIATION, INC.


By:_____
        Dean Warhaft, President


Attest:_____
        Michael Smith, Secretary

*Exhibit "C"*

# City of Miami, Florida



**ARTHUR NORIEGA, V**
CITY MANAGER

P.O. Box 330708
MIAMI, FLORIDA 33233
(305) 250 5400

August 6, 2020

<u>Sent via USPS and Posted on the Property</u>

Dean Warhaft
1750 North Bayshore Drive
Miami, Florida 33132
dwarhaft@fecr.com

RE:   Cease and Desist Letter
      Violations of City Code
      Property Address: 1750 North Bayshore Drive

Dear Mr. Warhaft:

This letter serves to inform you that the above property in the City of Miami ("City") is the subject of an ongoing investigation by the Department of Code Compliance because of community complaints that units are being used as short-term/vacation rentals in violation of City code.

Please be advised, that as has been discussed with the Office of Zoning, that while Lodging may be allowed by right, by warrant or by exception depending on the Zoning transect designation, any property owner wishing to offer their residence as Lodging must comply with the requirements of the City of Miami Code. The City of Miami permitting process includes Building, Fire, and other life-safety requirements applicable to Lodging Uses for purposes of building permits. Moreover, any building offering Lodging must comply with all requirements of the Americans with Disabilities Act (ADA) applicable to Lodging Uses, and have the appropriate Certificate of Occupancy and Certificate of Use for the activity.

The City of Miami will continue with this investigation and move forward to prosecute this matter by any allowable means, including, but not limited to, seeking injunctive relief with the Eleventh Judicial Circuit in Miami-Dade County, Florida, fines, and per diem liens subjecting the property to foreclosure in the future.

Please be sure to maintain your property to the standards required by the State of Florida, the Code of the City of Miami, Florida, and Miami 21, the Zoning Ordinance for the City of Miami to avoid further action.

Thank you for your immediate attention to this matter.

Sincerely,

*Adele Valencia*
Adele Valencia
Director, Code Compliance
City of Miami, AValencia@MiamiGov.com

*Exhibit "D"*

JLB Baloyra Law

SUNTRUST PLAZA
201 ALHAMBRA CIRCLE
SUITE 501
CORAL GABLES, FLORIDA 33134

Chris Childs
390 Stovall Street SE Unit 2310
Atlanta GA 30316-1535

$0.530
US POSTAGE
FIRST-CLASS
FROM 33134
MAR 16 2022
stamps.
endicia



JLB Baloyra Law

SUNTRUST PLAZA
201 ALHAMBRA CIRCLE
SUITE 501
CORAL GABLES, FLORIDA 33134

CERTIFIED MAIL

7020 1290 0000 1293 3229

Chris Childs
390 Stovall Street SE Unit 2310
Atlanta GA 30316-1535

$7.530
US POSTAGE
FIRST-CLASS
FROM 33134
MAR 16 2022
stamps.
endicia



JOSE L. BALOYRA
MILTON FUENTES - *OF COUNSEL*

SUNTRUST PLAZA
201 ALHAMBRA CIRCLE
SUITE 501
CORAL GABLES, FLORIDA 33134

TEL. (305) 442 4142
FAX (305) 442 4377

WWW.BALOYRALAW.COM

March 16, 2022

## FINAL WARNING TO CEASE AND DESIST UNLAWFUL SHORT TERM RENTALS

Chris Childs
390 Stovall Street SE Unit 2310
Atlanta, Georgia 30316-1535
Email: ivippskipline@gmail.com

*SENT VIA ELECTRONIC MAIL and U.S MAIL*

Re:   Unlawful Short Term Rentals at OPERA TOWER CONDOMINIUM (the "Condominium")
P/A:   1750 North Bayshore Drive, Unit 3514, Miami, Florida 33132

Dear Tenant:

Our firm serves as counsel to the Opera Tower Condominium Association (the "Association"). The Association operates the Opera Tower Condominium located at 1750 North Bayshore Drive, Miami, Florida 33132 (the "Condominium").

The Association has determined that you are engaged in an unlawful use of the unit you are renting at the Condominium by subleasing the unit for short term rentals through Airbnb.com ("AIRBNB"), VRBO.COM and/or HOMEAWAY.COM ("VRBO") and possibly other lodging sites. The listing of the unit for short term rentals (for a term of less than 30 days) is in violation of the Miami 21 Zoning Code. To begin with the Condominium does not have a certificate of use for lodging. In addition, the Condominium does not have the required building components to be eligible as a place of lodging under the Miami 21 Zoning Code.

Further, the Declaration of Condominium for Opera Tower (the "Declaration"), at Section 16.1, provides that "Each Residential Unit shall be used in accordance with all applicable county and state zoning codes, ordinance and regulations…" While this section does not prohibit short term rentals outright, any such use must be done in accordance with applicable law. As aforementioned, **since the Condominium does not have a certificate of use as a place of lodging, short term rentals of your unit are a violation of applicable law.**

1

Further, the City of Miami has issued a cease and desist letter to the Association on August 6, 2020 pursuant to which it demanded that the Association comply with the City of Miami Code and cease all short term rental activity at the Condominium (see attached copy).

Accordingly, demand is hereby made that you immediately remove any and all listings and/or pending reservations for short term rentals at the Condominium. Your continued listing of the unit for short term rentals gives rise to causes of action against you for breach of the Declaration, termination of your lease, and injunctive relief. Should the Association file suit against you it will seek reimbursement of its attorneys' fees and costs.

THIS IS A FINAL A WARNING AND SHOULD YOU CONTINUE ENGAGNG IN SHORT TERM RENTALS A LAWSUIT WILL BE FILED AGAINST YOU.

GOVERN YOURSELF ACCORDINGLY.

BALOYRA LAW

*Jose L Baloyra*

Jose L. Baloyra

cc:  Property Manager
      Board of Directors
      Unit Owner – Rosario Delucia

2

# City of Miami, Florida



**ARTHUR NORIEGA, V**
CITY MANAGER

P.O. Box 330708
MIAMI, FLORIDA 33233
(305) 250 5400

August 6, 2020

Sent via USPS and Posted on the Property

Dean Warhaft
1750 North Bayshore Drive
Miami, Florida 33132
dwarhaft@fecr.com

RE:   Cease and Desist Letter
      Violations of City Code
      Property Address: 1750 North Bayshore Drive

Dear Mr. Warhaft:

This letter serves to inform you that the above property in the City of Miami ("City") is the subject of an ongoing investigation by the Department of Code Compliance because of community complaints that units are being used as short-term/vacation rentals in violation of City code.

Please be advised, that as has been discussed with the Office of Zoning, that while Lodging may be allowed by right, by warrant or by exception depending on the Zoning transect designation, any property owner wishing to offer their residence as Lodging must comply with the requirements of the City of Miami Code. The City of Miami permitting process includes Building, Fire, and other life-safety requirements applicable to Lodging Uses for purposes of building permits. Moreover, any building offering Lodging must comply with all requirements of the Americans with Disabilities Act (ADA) applicable to Lodging Uses, and have the appropriate Certificate of Occupancy and Certificate of Use for the activity.

The City of Miami will continue with this investigation and move forward to prosecute this matter by any allowable means, including, but not limited to, seeking injunctive relief with the Eleventh Judicial Circuit in Miami-Dade County, Florida, fines, and per diem liens subjecting the property to foreclosure in the future.

Please be sure to maintain your property to the standards required by the State of Florida, the Code of the City of Miami, Florida, and Miami 21, the Zoning Ordinance for the City of Miami to avoid further action.

Thank you for your immediate attention to this matter.

Sincerely,

*Adele Valencia*

Adele Valencia
Director, Code Compliance
City of Miami, AValencia@MiamiGov.com